IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 1:16-mj-63 |
| NISREEN ASSAD IBRAHIM BAHAR, aka "Umm Sayyaf," | |
| *Defendant*. | |

## GOVERNMENT'S RESPONSE TO MOTION
## TO ENFORCE RIGHTS UNDER THE CRIME VICTIMS' RIGHTS ACT

The United States government takes seriously its obligations and responsibilities to victims of crime, and particularly the victims in this case, who suffered horrifying abuse at the hands of Umm Sayyaf, her husband, and other members of ISIS. The government has endeavored and continues to endeavor to use its best efforts to provide these victims with information and resources, both within the context of the Crime Victims' Rights Act (CVRA), 18 U.S.C. § 3771, and outside the statute's four corners. In particular, the government supported the victims' request to be deemed crime victims under the CVRA and has repeatedly discussed the case with the victims' counsel, both before and after the filing of their motion.

Subsequent to the filing of their motion, the government promptly began the process of determining answers to the categories of information requested by the victims in that motion. The government sought a meeting with the victims' counsel and provided what initial categories of information requested in the motion as were available at that time. At that meeting, the government received further requests for information from the victims' counsel and has provided additional information to address some of those additional requests. At present, the government believes it

has substantially addressed the victims' specific requests as communicated to it, including their two major requests for information, with some additional processes ongoing. First, the government has orally provided the victims with more detailed information about the Iraqi prosecution, including relevant information about the charges, evidence presented, and disposition, including two levels of appeal. Per a request from victims' counsel, the government is currently seeking permission from the foreign government to make details of the Iraqi prosecution available to them in a written form that can be made public.

Second, the government has provided the victims with further explanation regarding Sayyaf's transfer to Iraq for prosecution. Although the government believes this request goes beyond the CVRA's scope, the government has elected to provide additional information in order to be helpful and aid the victims. In doing so, we note that the U.S. government's decision to transfer Umm Sayyaf, and the circumstances surrounding that transfer, involved sensitive and privileged information and implicated foreign relations, necessarily limiting the amount of information or explanation we can provide.

The government notes that, as announced by the U.S. Department of Defense (DOD) at the time, the U.S. government determined that transfer to the Iraqi government for prosecution was "appropriate with respect to legal, diplomatic, intelligence, security, and law enforcement considerations."[1] The government provided further explanation to the victims' counsel today, stating that relevant considerations influencing its decision to transfer Sayyaf included that Sayyaf was an Iraqi citizen, that she was being detained in Iraq by DOD forces, that Iraqi authorities sought to prosecute her for terrorism offenses, and that she faced significant penalties if she were convicted,

---

[1] *Available at* https://www.defense.gov/Newsroom/Releases/Release/Article/612827/defense-department-announces-the-transfer-of-umm-sayyaf/.

as she ultimately was. Accordingly, and as indicated by the U.S. Department of Justice's (DOJ) statement later announcing its own charges, the U.S. government supported the Iraqi prosecution of Sayyaf as an appropriate method of holding her accountable for her crimes.

In short, the vast amount of relief sought by the victims has been achieved through the cooperation of the victims' counsel and the government. The government believes it has not only met its obligations under the CVRA but substantially exceeded them by providing far more than the statute's plain text contemplates.[2] To be sure, some substantive disagreements yet remain between the government and the victims, including for example whether additional charges or formal extradition of Umm Sayyaf should be sought, as victims' counsel have suggested. These substantive disagreements, however, are beyond the scope of the CVRA's remedies. While the government may disagree with or decline to grant the victims' requests for certain substantive steps in this case, it remains committed to the conferral process and implementing the CVRA's rights in this prosecution.

## BACKGROUND

### I.    The Defendant and the Charged Offense Conduct

Defendant Nisreen Assad Ibrahim Bahar, an Iraqi citizen also known as "Umm Sayyaf," has been charged in a criminal complaint alleging one count of conspiring to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B. *See* Dkt. 1. In sup-

---

[2] As a matter of pure law, the government does not believe that the CVRA's obligations extend as broadly as the victims' motion suggests or that the statute authorizes some of the victims' requested relief, particularly concerning obligations relating to acts or information outside of the proceedings of this federal criminal case. Nonetheless, the government wishes to assist the victims where it can and so has made its best efforts to provide the information the victims have requested, even where that assistance is not mandated by the CVRA. Accordingly, as of now, the government does not believe any disputes about the legal contours of the statute are necessary to resolve.

porting this complaint, an affidavit alleges that Umm Sayyaf conspired to provide property, personnel (including herself), services, lodging, and safehouses to the Islamic State of Iraq and the Levant (ISIS), knowing that the organization was a designated terrorist organization, that it conducted terrorist activity as defined by 8 U.S.C. § 1182(a)(3)(B), and that it engaged in terrorism as defined by 22 U.S.C. § 2656f(d)(2). The complaint further alleges that Kayla Mueller, an American citizen, and three other unnamed individuals were forcibly kidnapped by ISIS fighters and detained in Syria. Two of these individuals were Yazidi women, a minority religious sect of the Kurdish people that ISIS has targeted for persecution. The complaint further alleges that Ms. Mueller and the two Yazidi women were eventually transported to the home of defendant Umm Sayyaf and her husband, Abu Sayyaf.

The complaint further alleges that these three women were held with other female captives in locked rooms by defendant and her husband, who threatened to kill them if they did not obey orders. The complaint alleges that defendant and her husband used firearms to guard the captives, showed them violent ISIS propaganda, and sold or traded certain of the captives to members of ISIS, whom they were compelled to serve as slaves.

The complaint further alleges that on or about May 15, 2015, U.S. Department of Defense (DOD) forces captured defendant in her home in a military operation that killed Abu Sayyaf. In a *Mirandized* interview with agents of the Federal Bureau of Investigation occurring around June 17, 2015, defendant admitted that she and her husband were responsible for maintaining custody of Ms. Mueller, the two Yazidi captives, and others on behalf of ISIS and that she had sole responsibility for holding them when her husband traveled. Defendant also admitted that ISIS members, including its leader Abu Bakr al-Baghdadi, would stay at her residence on an as-needed basis and that large amounts of currency and firearms were stored at her residence for ISIS.

## II.    Procedural History

As alleged in the complaint, Umm Sayyaf was captured by the U.S. military in mid-May 2015. Sayyaf was subsequently detained in Iraq under DOD custody. On August 6, 2015, the Kurdistan Regional Government (KRG) in Iraq obtained a KRG arrest warrant for defendant on terrorism charges and DOD transferred her to Kurdish custody. At no time prior to her transfer to Kurdish authorities (or any time thereafter) did the United States, or any of its components, enter into a non-prosecution, deferred-prosecution, or bargained resolution to any potential criminal charge with the defendant. The federal law enforcement investigation into potential federal charges was ongoing at that time, and the government had not charged defendant with any federal crimes prior to her transfer by DOD to Kurdish custody.

According to information subsequently received by the U.S. government from Kurdish authorities, defendant was convicted of a terrorism offense before a KRG judge in December 2015. The United States further understands that defendant's conviction was affirmed on two levels of appeal, first in March 2016 and then in May 2016 by the Court of Cassation, the court of last resort in Iraq. Defendant was sentenced to life imprisonment, and that sentence was also affirmed on appeal. The KRG has confirmed to the United States that defendant remains in KRG custody, still serving her life sentence.

On February 8, 2016, the U.S. Attorney's Office for the Eastern District of Virginia (EDVA) filed the complaint in this case, charging defendant with one count of conspiracy to provide material support to a foreign terrorist organization. In publicly announcing the charge, the Assistant Attorney General for National Security stated that the United States "fully support[s] the Iraqi prosecution of Sayyaf and will continue to work with the authorities there to pursue our

shared goal of holding Sayyaf accountable for her crimes."[3] Like any federal terrorism charge, the charge filed in this case served important interests and, in this instance, also served as a safeguard in the event that the Iraqi prosecution and sentence did not hold Sayyaf accountable for her crimes.

## III.    The Government's Engagement with the Victims

In February 2017, the government received letters from counsel for some of the victims, indicating that they represented two Yazidi women pseudonymously named Jane Doe and Mary Roe. Counsel did not disclose the real identities of these women but described them as having been held by Umm Sayyaf in her home and subjected to abuse, sexual slavery, and domestic labor. In response, the government set up a March 1, 2017, meeting, attended not only by members of the EDVA prosecution team but EDVA supervisors and supervisors from the National Security Division (NSD) of DOJ. At that meeting, the government indicated that it was not necessary to take a formal position on the clients' status as "crime victims" under the CVRA because regardless of the statutory standard, the government intended to treat them as such and provide them with the rights, information, and assistance contemplated by the statute as well as further information and services as appropriate. In response to counsel's inquiry regarding extradition, the government stated that it did not currently intend to seek Sayyaf's extradition because the government supported her Iraqi prosecution, which resulted in a conviction and the imposition of a life sentence that held her accountable for her crimes.  In addition, the government noted that, even though it did not intend to seek extradition considering the successful result of Sayyaf's Iraqi prosecution, it understood that the Iraqi constitution prohibited extradition of Iraqi citizens like Sayyaf.[4]

---

[3] *See* Press Release, DOJ.gov, https://www.justice.gov/opa/pr/wife-dead-isil-leader-charged-death-kayla-jean-mueller.

[4] At all times relevant to the events in this matter, the Iraqi Constitution prohibited the extradition

Roughly one year later, on May 11, 2018, the victims' counsel sent the prosecution team a letter in which they urged the government to reconsider seeking extradition. In that letter, they related that through KRG and U.S. officials, they learned of defendant's conviction but believed that information about her treatment of their clients was not a part of the Iraqi prosecution. They also disputed that extradition to the United States would be prohibited under Iraqi law and further proposed that the United States charge defendant with additional offenses, including hostage-taking, genocide, or war crimes, in order to invoke provisions of international conventions that they believed Iraqi courts would find to override the constitutional prohibition on extradition.

In February 2019, the victims' counsel sent the prosecution team another letter, in which they identified as clients three additional Yazidi women, pseudonymously named Mary Roes II through IV. They indicated that Mary Roes II and III had been held by Umm Sayyaf for at least a month before being sold to another member of ISIS. They also indicated that Mary Doe IV, whom they have since identified as Nasima Avdo Saleh, was taken captive with her daughter, Inas (described in the letter as Mary Roe V), who information suggested had been held for nine months by defendant and her husband at various residences.

The victims filed their motion to enforce rights under the CVRA on April 22, 2021. In their memorandum of law, the victims stated that they had been unable to obtain five categories of information from the government:

(1)     the Defendant's charges, trial, conviction, sentence and detention by the KRG;

(2)     the conduct of the trial, including the evidence that was presented, and the conduct that formed the basis of the allegations and conviction;

---

or surrender of Iraqi nationals to foreign governments. *See* Iraqi Constitution of 2005, sec. 2, ch. 1, art. 21(1), *available at* Library of Congress, https://www.loc.gov/law/help/guide/nations/iraq.php.

(3)     the location and conditions of the Defendant's current detention, including any potential for the Defendant's early release, prisoner-exchange deal, or escape;

(4)     the circumstances of the Defendant's transfer from U.S. to KRG custody in 2015, including any understandings or agreements relating to the Defendant; and

(5)     any efforts that the Government has taken, or is planning to take, if any, to extradite or transfer the Defendant to the United States to face charges.

Dkt. 15, at 23 (paragraph breaks added).

Following the filing of that motion, the prosecution team reached out to the victims' counsel to confer regarding the victims' sought information and their desire for a determination on victim status. In that meeting, the government confirmed that it would join the victims' request to be deemed crime victims under the CVRA and addressed their other requests for information. The government verbally communicated to the victims' counsel its understanding of the charges of which Sayyaf was convicted by the KRG, the evidence presented at trial, her appeals, and her continuing detention by the KRG. Per the victims' counsel's request, the government is seeking authorization from the foreign government to share details of the Iraqi prosecution in writing that is not subject to any restrictions on dissemination. That process remains ongoing as of the date of this filing.

In addition, the government confirmed to the victims' counsel that the United States has entered into no agreements with defendant that would bar or limit her prosecution in the United States, such as a deferred prosecution agreement, non-prosecution agreement, or immunity agreement. The government also confirmed that the United States has no current plans to seek extradition and understands that, in any event, extradition to the United States likely would be barred by the Iraqi constitutional provision prohibiting the surrender of Iraqi nationals to foreign governments.

8

Also during that call, the victims' counsel also expressed a desire for regular updates on the status of defendant's detention in Iraq; for more information regarding the reason the United States transferred Umm Sayyaf to the KRG for prosecution rather than removing her to the United States for prosecution; and for information on any right to restitution to which the victims may be entitled. The United States agreed in principle to see if any administrative measures may be taken to obtain regular updates from the Iraqi government, and it is continuing to explore options for such measures. In a subsequent call, the United States informed the victims' counsel that while the restitution statutes require a criminal conviction and thus would not be available unless defendant were convicted in a U.S. court, the victims might be able to obtain some recovery in certain civil forfeiture actions instituted by the United States against defendant's property.

Regarding the victims' request for additional information regarding defendant's transfer to the KRG, the government diligently evaluated the victims' request, given the sensitive context in which that decision occurred. Having considered the request carefully, the government was able today to disclose to victims' counsel the additional explanation regarding relevant considerations to that decision, as set forth above.

## ARGUMENT

The United States has agreed, based on the detailed affidavits submitted by the victims' counsel, that they are victims as defined by the CVRA.[5] Even prior to that formal determination, however, the United States had agreed that it would treat these individuals as victims and provide

---

[5] This prosecution is not an ordinary one. The defendant is an Iraqi national who has never been brought to the United States, who was captured overseas in a military raid of a terrorist complex and held for two and half months in Iraqi territory under U.S. military custody, whom the Iraqi regional government sought to prosecute and then successfully did so, who is serving a life sentence in Iraqi custody after an Iraqi criminal trial, and whom the Iraqi Constitution prohibits being extradited from Iraq. By contrast, the United States' criminal prosecution of this defendant consists of, so far, a criminal complaint and sworn affidavit.

them with the rights contemplated by the CVRA. Indeed, the United States has provided and continues to provide appropriate information far exceeding the CVRA's scope to further assist these victims. Following the filing of the victims' motion, the United States has endeavored to engage in collaborative and constructive discussions with the victims' counsel, seeking to provide requested information and resolve potential disputes where possible, as detailed above.  Throughout that process, the United States has made its best efforts to provide these victims not only with substantial information and access to the prosecution team, but also assistance in obtaining additional information relating to the Iraqi prosecution. In short, the United States believes it has fully complied with both the letter and spirit of the CVRA.

**I.      The government has met all of its obligations under the CVRA.**

The CVRA provides crime victims with a set of notice and participatory rights in the federal prosecution of an individual whose offense caused them direct and proximate harm. Here, the prosecution with which the victims—all of whom are Iraqi nationals—are most concerned is an Iraqi prosecution of another Iraqi national. While the government believes the CVRA's text does not extend to foreign prosecutions, the government has nonetheless actively taken steps to procure and disclose information requested by the victims' counsel. Much, if not all, of the remaining disagreement between the victims and the government concerns substantive steps that were or may be taken by the United States government, and the CVRA does not address itself to substantive decisions implicating prosecutorial discretion or foreign policy.

**A.      Notwithstanding that the CVRA is limited to U.S. federal prosecutions, the government has actively provided the victims with assistance far exceeding the statute's scope.**

The CVRA states that "[a] crime victim has the following rights:

10

(1) The right to be reasonably protected from the accused.

(2) The right to reasonable, accurate, and timely notice of any public court proceeding, or any parole proceeding, involving the crime or of any release or escape of the accused.

(3) The right not to be excluded from any such public court proceeding, unless the court, after receiving clear and convincing evidence, determines that testimony by the victim would be materially altered if the victim heard other testimony at that proceeding.

(4) The right to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding.

(5) The reasonable right to confer with the attorney for the Government in the case.

(6) The right to full and timely restitution as provided in law.

(7) The right to proceedings free from unreasonable delay.

(8) The right to be treated with fairness and with respect for the victim's dignity and privacy.

(9) The right to be informed in a timely manner of any plea bargain or deferred prosecution agreement.

(10) The right to be informed of the rights under this section and the services described in section 503(c) of the Victims' Rights and Restitution Act of 1990 (42 U.S.C. 10607(c)) and provided contact information for the Office of the Victims' Rights Ombudsman of the Department of Justice.

18 U.S.C. § 3771(a). As is evident from the text, many of these rights require a balancing of reasonableness, and all are committed to the discretion of the district court. *See, e.g.*, *In re W.R. Huff Asset Mgmt., Inc.*, 409 F.3d 555, 562–63 (2d Cir. 2005).

Notwithstanding the CVRA's textual inapplicability to foreign prosecutions,[6] the government has made its best efforts to accommodate the victims' requests for information about the Iraqi prosecution. The government has requested and received information from the foreign government, including seeking permission to share information without restrictions on further dissemination or use. In doing so, the government has been able to provide information in response to the victims' five categories of requests in their memorandum of law. The government has also provided the victims' counsel with further explanation about the decision to transfer Sayyaf to the KRG, as explained above. In large part, therefore, the information the victims filed their motion to obtain has been voluntarily provided by the government. Moreover, the government has expressed to the victims' counsel that it remains open to discuss the case and conduct additional conferrals as is necessary.

As noted above, many of the CVRA's rights, including the conferral right, are measured by a rubric of "reasonableness." *See* § 3771(a)(5). Where those rights have attached to this federal prosecution, the government believes its actions have amply met and exceeded that standard, and it has endeavored to go beyond those rights to provide additional assistance to the victims. As discussed above, this case involves unique circumstances. Umm Sayyaf was captured by a U.S. military raid in May 2015 and held on Iraqi soil in DOD custody between that time and her transfer to the KRG on August 6, 2015. Moreover, in addition to the ongoing investigation and consideration whether to file criminal charges (considerations that resulted in the instant criminal complaint

---

[6] *See, e.g.*, *In re Brown*, 932 F.3d 162, 169 (4th Cir. 2019) (holding that references to a "court" in the CVRA are defined as a "federal judge performing functions authorized by law," indicating that the statute covers only federal proceedings); *United States v. Moussaoui*, 483 F.3d 220, 225 (4th Cir. 2007) ("The rights codified by the CVRA, however, are limited to the criminal justice process …."); see also H. Rep. 108-711, tit. I, sec. 102, 2004 U.S.C.C.A.N. 2274, 2283 (Sept. 24, 2004) (describing the CVRA as "codify[ing] eight statutory rights of crime victims in the Federal judicial system").

in October 2016), Umm Sayyaf's military detention and subsequent transfer involved sensitive and privileged information and questions of foreign policy. Even assuming *arguendo* application of the CVRA, certain actions would not have been reasonably required in light of all these circumstances.[7]

However, regardless of any differences between the victims' and the government's legal interpretations, the government certainly appreciates the victims' concerns and desire for information and has made its best efforts to provide the requested information where feasible and appropriate. As such, the government does not believe relief is currently required, as it remains open to conferring with victims' counsel on the outstanding requests and as further issues arise.

**B.      To the extent relief requires adjudicating issues of prosecutorial discretion or foreign policy, the CVRA is not an appropriate mechanism.**

As a final matter, the government does acknowledge that there remain some substantive differences between the government's and the victims' positions. One of the goals the victims' counsel has articulated both in meetings with the government and in their motion to the Court is the desire to see Umm Sayyaf extradited to the United States on the current charge or additional

---

[7] For example, the government notes that the victims have suggested that the government may have violated the CVRA by not conferring with them prior to Sayyaf's transfer by DOD to the KRG. *See* Dkt. 15, at 26 (citing § 3771(a)(2), (5)). The government respectfully disagrees. Section 3771(a)(2) and (5) provide for reasonable notice of public court proceedings and the right to confer with counsel for the government. Of course, prior to defendant's transfer, there had been no public court proceedings. Moreover, the transfer was neither a step in, nor a disposition of, the federal prosecution, as evidenced by Sayyaf's subsequent charging by this office. Lastly, with the exception of Mary Roe being rescued by U.S. military forces in the raid that captured Umm Sayyaf, the prosecution team did not know of the existence or identity of any movant when the transfer occurred in August 2015 (and still does not know their exact identities, with the exception of Ms. Saleh). In any event, the government's voluntary production of the information the victims have sought renders such disputes moot.

charges as needed to effectuate that extradition. While the government understands—and welcomes—the victims' views on the subject, disputes over the propriety of the government's actions with respect to charges or extradition fall outside the scope of the CVRA.

With respect to prosecutorial discretion, the CVRA is explicit: "Nothing in this chapter shall be construed to impair the prosecutorial discretion of the Attorney General or any officer under his direction." § 3771(d)(6). Nor could it: subject to certain constitutional limitations such as equal protection, for example, "the Executive Branch has exclusive authority and absolute discretion whether to prosecute a case." *United States v. Nixon*, 418 U.S. 683, 693 (1974); *see also United States v. Armstrong*, 517 U.S. 456, 464–65 (1996) (defining prosecutorial discretion as a "special province" and "core executive constitutional function").

In this case, prosecutorial discretion is layered atop a second core Executive Branch function. The circumstances surrounding defendant's capture and initial detention by DOD on Iraqi soil, the transfer to the KRG, and any future request to extradite defendant after conviction in Iraq all necessarily involve political judgments of foreign policy and impact the United States' relationship with another sovereign nation—in whose territory the U.S. military had custody of defendant—all core Executive Branch functions. *See, e.g.*, *Oetjen v. Central Leather Co.*, 246 U.S. 297, 302 (1918) ("The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision.").

Certain of the victims' contentions go directly to these core prerogatives. For example, the victims have argued that the Iraqi Constitution would not in fact prohibit extradition of Umm Sayyaf, either now or if the United States chose to add charges. But the interpretation of a foreign

government's law—and more so, the decision whether to engage in bilateral discussions with that foreign government and press for a particular outcome—are core foreign policy decisions committed to the discretion of the Executive Branch. Though the victims have suggested the government has failed to "adequately explain" its position (Dkt. 15, at 13), the government respectfully disagrees, as indicated above. Similarly, whether to add or replace charges against the defendant that might trigger international or bilateral treaties is a quintessential exercise of prosecutorial discretion. The victims' disagreement with the government's reasoning—while unfortunate—does not give rise to a violation of the CVRA. *See United States v. Nix*, 256 F. Supp. 3d 272, 278–79 (W.D.N.Y. 2017) (citing case law).[8]

## CONCLUSION

The government takes seriously the victims' request for information and, as a result, has actively sought to answer their questions.  It believes its discussions with the victims' counsel have been productive, respectful, and collaborative. The government remains committed to engaging with the victims in this case and reiterates its commitment to providing them with all the rights contemplated by the CVRA and to provide such additional information as it can, where appropriate and available.

---

[8] Further, to the extent the victims are seeking relief under the CVRA that would require—or necessarily implicate—a decision by the Executive Branch whether and under what charges to prosecute defendant, such relief is not available under the statute. Indeed, the victims acknowledge that their proposed method of seeking extradition would require the government to charge an as-yet uncharged offense of hostage-taking, in order to invoke an international treaty that they argue will supersede Iraqi constitutional law. *See* Dkt. 15 at 25. Resolving such arguments would compel this Court to order the Executive Branch to make substantive decisions about what charges to file, when to bring charges to a grand jury, or what diplomatic position to take with a foreign government. Those decisions are committed to the Executive Branch's discretion, and the CVRA does not provide a mechanism to review them.

Respectfully submitted,

RAJ PAREKH
ACTING UNITED STATES ATTORNEY

By:   _____/s/_____
       Dennis Fitzpatrick
       Aidan Taft Grano
       Assistant United States Attorneys
       United States Attorney's Office for the Eastern
           District of Virginia
       2100 Jamieson Avenue
       Alexandria, VA 22314
       Tel.: (703) 299-3700
       Fax: (703) 299-3981
       dennis.fitzpatrick@usdoj.gov
       aidan.grano@usdoj.gov

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 2, 2021, I electronically filed the foregoing using the CM/ECF system, which will send a notification of such filing to all counsel of record.

_/s/_

Aidan Taft Grano
Assistant United States Attorney

17